# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JENNIFER HALL, | ) | |
| 5415 Woodland Ct. | ) | |
| Oxon Hill, MD 20745 | ) | Case No.: |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| DISTRICT OF COLUMBIA | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |
| Serve: | ) | |
| | ) | |
| Karl Racine | ) | |
| ATTORNEY GENERAL OF | ) | |
| THE DISTRICT OF COLUMBIA | ) | |
| 400 6th St. NW | ) | |
| Washington, DC 20001 | ) | |
| _____ | ) | |

## COMPLAINT

COMES NOW, Plaintiff, Jennifer Hall (hereinafter "Plaintiff" or "Ms. Hall"), by and through undersigned counsel, with her Complaint for compensatory and injunctive relief, and states as follows:

## INTRODUCTION

Plaintiff is an African American woman who is currently employed by Defendant, in the District of Columbia Department of Transportation (hereinafter "DDOT") as a Program Analyst. In April of 2018, Plaintiff's direct manager, Mr. Harvey Alexander (hereinafter "Mr. Alexander") began to sexually harass her.  Mr. Alexander professed that he believed himself to be "in love" with Plaintiff, forcibly kissed her on the mouth, and on numerous occasions made sexual advances,

including inappropriately touching Plaintiff.  Sadly, Plaintiff was not the only woman who was affected by Mr. Alexander's inappropriate behavior, and Plaintiff learned that Mr. Alexander has and would repeatedly use his power to groom, control, manipulate and retaliate against women in the department.

Plaintiff filed a formal internal complaint against Mr. Alexander with her department EEO office, and after an investigation, her claims were in large measure, substantiated.  However, the DDOT EEO office took more than a year to investigate and respond to Plaintiff's claim, and in no way held Mr. Alexander accountable for the things he had done to Plaintiff.  During the time that Defendant was dithering, Plaintiff was subjected to egregious retaliation from Mr. Alexander and his cronies. Plaintiff timely filed a complaint with the District of Columbia Office of Human Rights, and filed a second complaint with the EEOC to address the escalating and ongoing retaliation she endured because of her protected activity.

Plaintiff  was subjected to daily, repeated, fear-inducing and traumatizing harassment that caused her such severe mental pain and emotional anguish, she was forced to seek care from a medical provider, long term counseling and anti-depressant medication.  Plaintiff's damages are the direct and proximate result of Mr. Alexander's harassment and DDOT's failure to take seriously Plaintiff's complaints and concerns about the conduct of her boss.  Plaintiff herein brings claims pursuant to Title VII of the Civil Rights Act of 1967, the District of Columbia Human Rights Act, the District of Columbia Whistleblower Protection Act, and Section 1981, by and through Section 1983 of the Civil Rights Act of 1866, alleging a violation of the 14th Amendment to the Constitution, as applied to the District of Columbia via the Fifth Amendment to the Constitution.

Plaintiff seeks compensatory damages, as well as fees, costs, interest and attorney's fees of not less than $4,000,000.00.  Plaintiff further seeks injunctive relief in the form of an ORDER mandating that Defendant cease and desist from all retaliatory actions against Plaintiff.

## PARTIES

1.     Plaintiff is an African American woman, who has been employed by DDOT since 2013.  She is a resident of the state of Maryland.

2.     Defendant District of Columbia is a municipality.  DDOT is a department of the District of Columbia government under the control of Mayor Muriel Bowser, and the City Council.


## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this matter because the claims herein arise under the laws of the United States.  Supplemental jurisdiction over Plaintiff's state law claims is proper because they arise out of the same facts as Plaintiff's federal law claims.  Venue is proper in this Court because all acts and omissions that form the basis of Plaintiff's claims took place in the District of Columbia.

## RELEVANT FACTS

4.     Plaintiff began her employment with the District of Columbia in April of 2013, as a Safety Technician for DDOT, grade 2.

5.     In 2014, Plaintiff was promoted to a Customer Service Specialist, grade 7.  During her tenure as a Customer Service Specialist, Plaintiff was such an exceptional performer, receiving the highest performance ratings from the Associate Director of DDOT, she was promoted again to a grade 9 role in 2016.

6.     Plaintiff's job title remained a Customer Service Specialist at the grade 9 level, but her duties substantially increased to handling the initial review processes for any construction within the District of Columbia.

7.     In October of 2015, Plaintiff was diagnosed with breast cancer, and was out of work for approximately eight (8) months.  She returned to work in June of 2016.  Within six weeks of her return to work, she was transferred to work in the traffic signals division, under Mr. Alexander.

8.     At first, Plaintiff's tenure in the traffic signals division was uneventful.  In fact, she was promoted again to grade 12, Program Analyst.

9.     In her new role, Plaintiff wasn't given any real responsibilities for approximately a year. At the time, there was another grade 12 Program Analyst in the office, Tammy Jones (hereinafter "Ms. Jones") who was working closely with Mr. Alexander.   Ms. Jones had to encourage Plaintiff to seek out duties and ask for responsibilities from Mr. Alexander, because most of the work was being done by Ms. Jones.

10.    Notably, at the time, Mr. Alexander was only willing to interact with Ms. Jones, and refused to engage or acknowledge Plaintiff, and further refused to give her any meaningful work.

11.    The hostile and obstructive way that Mr. Alexander treated Plaintiff was so noticeable, that Ms. Jones attempted to help Plaintiff by giving suggestions on how to break the ice.

12.     During several conversations with Plaintiff, Ms. Jones admitted to Plaintiff that Mr. Alexander was engaged in inappropriate and harassing behavior towards Ms. Jones.  According to her, Mr. Alexander repeatedly referenced and discussed his sexual relationship with his wife, monitored Ms. Jones using her computer camera, followed Ms. Jones to the dog park and to places outside of work, and made other lewd and suggestive comments.

13.     In exchange for Ms. Jones' silence about Mr. Alexander's behavior, Ms. Jones received all of the assignments and overtime opportunities.  However, her discomfort about Mr. Alexander's behavior escalated to the point that Ms. Jones asked Plaintiff to always be with her when Ms. Jones went to speak to Mr. Alexander.

14.     Although it was not clear at the time, Ms. Jones was using Plaintiff as a shield during her interactions with Mr. Alexander.

15.     Because of the dynamic between Ms. Jones and Mr. Alexander, Plaintiff really had no one on one interaction with Mr. Alexander at all.

16.     On or about August 14, 2018, Ms. Jones was out of the office, and Plaintiff sent Mr. Alexander an email about a response to a city works complaint.  Plaintiff had responded to a staff member about the complaint, and Mr. Alexander wrote a scathing email to Plaintiff about her response.

17.     Believing that she needed to explain herself and clear the air, Plaintiff, for the first time, went to meet with Mr. Alexander alone.

18.     At around 10:00am on August 14, 2018, Plaintiff went into Mr. Alexander's office to discuss his email.  Plaintiff was visibly upset by his email, and asked why he was so hostile and rude.  Specifically, Plaintiff said:  "How would you feel if someone talked to your wife or your daughter the way you talked to me?" or words to that effect.

19.     In response, Mr. Alexander started to apologize, and stated that he didn't mean to be so harsh.  And then, Mr. Alexander confessed that Plaintiff "meant so much to him," or words to that effect.  Mr. Alexander then asked if he could come sit next to Plaintiff, who had been crying at the time.  Plaintiff didn't think much of it until Mr. Alexander's tone completely changed.

20.     At that point in the conversation, Mr. Alexander informed Plaintiff that he had been resisting sexual attraction and feelings for Plaintiff, and that it was this tension within him that was causing his brusque and abrupt tone with Plaintiff.

21.     Mr. Alexander stated that Plaintiff made him nervous, which is why Mr. Alexander was rude and did not speak to Plaintiff, and then stated, "Don't you know I love you?" or words to that effect.

22.     At the turn of the conversation, Plaintiff, who was shocked by what Mr. Alexander was saying, became even more uncomfortable because Mr. Alexander started talking about his sexual relationship with his wife.

23.     Specifically, Mr. Alexander complained about the fact that he had to beg his wife for sex. When Plaintiff visibly recoiled from the topic, and her facial expression demonstrated her discomfort, Mr. Alexander asked Plaintiff why she was making a face.

24.     Plaintiff stated that she was unaware that she was making a face, and started to extract herself from the situation.

25.     As Plaintiff was making moves to leave, Mr. Alexander asked if he could give Plaintiff a hug.

26.     Plaintiff reasoned that if she agreed, it would end the conversation, and she could extract herself from the wildly inappropriate conversation she was subjected to.

27.     But instead of giving Plaintiff a hug, Mr. Alexander pulled Plaintiff into him and forcibly placed his mouth on hers to kiss her.

28.     Plaintiff pulled herself out of his arms, opened the door behind her and immediately left, stating that she had to get back to work.

29.     Within a few minutes of this incident, Mr. Alexander appeared at Plaintiff's desk, something he had never done before, and demanded that Plaintiff take him to 55 M. St, NW because he had a meeting that he could not be late for.

30.     At the time, Mr. Alexander had a government-issued vehicle that remained at the building exclusively for his use in executing his duties.  Never before had Mr. Alexander asked Plaintiff to drive him anywhere.

31.     That day, Mr. Alexander insisted that Plaintiff drive him to the meeting on M St., NW, thus placing Plaintiff back in isolation with him.

32.     In order to avoid this frightening situation, Plaintiff went to ask one of her male colleagues, Robert Waller (hereinafter "Mr. Waller") who was very close to Mr. Alexander, to drive Mr. Alexander to the meeting.

33.     Mr. Waller laughed at Plaintiff, and told her that she needed to do it.  While Plaintiff ordinarily would have asked another male colleague to help out, there were no others in the office at the time.

34.     Because Mr. Waller and Mr. Alexander were very close, Plaintiff did not feel comfortable telling Mr. Waller what had happened, or explaining why she needed his help.

35.     At the time, Plaintiff and Ms. Jones were the only women in an office with at least twelve (12) men.

36.     That day, Plaintiff was wearing a dress to work, which was appropriate attire because Plaintiff is not a field worker.

37.     Approximately ten minutes later, when Plaintiff had returned to her desk, Mr. Alexander appeared with his briefcase and stated that they needed to go.  Plaintiff, feeling she had no choice,

and not wanting to cause an altercation, got up from her desk and escorted Mr. Alexander to the garage.

38.     They got in his government vehicle (a Ford Expedition or similar vehicle), and Mr. Alexander chose to drive.  This begged the question of why Plaintiff needed to go with him.

39.     At the time, Plaintiff was extremely nervous, and seeking to talk about anything but Mr. Alexander's feelings for her, or the sexual topics Mr. Alexander raised in his office.  Plaintiff began talking about the city architecture, and even raised Mr. Alexander's church affiliation, in the hopes of reminding him of his moral groundings.

40.     At that point, Mr. Alexander reached out and put his hand up Plaintiff's skirt, stroking and caressing Plaintiff's upper thigh.  She was not wearing panty hose or tights at the time.  Plaintiff scooted over to get as close to the passenger side door as she could, to get out of his reach, but was unsuccessful in doing so.

41.     Plaintiff, however, did not hit or remove Mr. Alexander's hand for fear of offending him, or worse of angering him.  Again, Plaintiff was alone in a car with Mr. Alexander, who could have driven off and taken her to any other destination.

42.     When they arrived at the M Street address, Mr. Alexander parked, and got out.  Plaintiff got out and went around to the driver's side of the vehicle.  Mr. Alexander went into the building, and Plaintiff drove the vehicle around the back to the area in front of the National's Park Stadium, and parked.

43.     Shaken, and upset, Plaintiff immediately thereafter called Ms. Jones.  Ms. Jones did not answer the call, so Plaintiff sent Ms. Jones four text messages, asking Ms. Jones to contact her immediately.

44.     The next person Plaintiff called was her cousin, Dr. Bridgett Green (hereinafter "Dr. Green").  Dr. Green also did not answer, so Plaintiff sent Dr. Green a text message asking her to immediately respond.

45.     While Plaintiff was waiting, Dr. Green responded to the text message, at which point Plaintiff informed her that Mr. Alexander had tried to kiss her.  Plaintiff and Dr. Green exchanged several text messages throughout the day.

46.     Between 5-10 minutes later, Ms. Jones called Plaintiff back.  As Plaintiff was trying to explain what had happened, Ms. Jones told Plaintiff to get out of the truck because Mr. Alexander had bugged the truck.

47.     Plaintiff got out of the vehicle and told Ms. Jones what had happened.  Plaintiff was so overwhelmed by the situation and upset, that Ms. Jones stated that she was going to come to assist Plaintiff.

48.     Approximately twenty minutes later, Plaintiff received a text message from Mr. Alexander stating that he was ready to go.  Plaintiff responded that she was pulling up to the front.  Mr. Alexander went to the driver's side and Plaintiff got out, careful to avoid his reach.  Plaintiff then got into the passenger side of the vehicle.

49.     At that time, Mr. Alexander stated that no one else had attended the meeting.  This caused Plaintiff to believe that the meeting was a ruse to get her alone.

50.     Plaintiff asked to be let out of the vehicle in the front of the building so that she would not be in the garage with Mr. Alexander.   Mr. Alexander let Plaintiff off in front of the building, and went back to her desk.

51.     At about 1:45pm, Ms. Jones arrived, and Ms. Jones asked Plaintiff to meet her at the very end of their corridor, which is a quiet, dark and low traffic area.

52.     Apparently, in between the time that Plaintiff had initially spoken with Ms. Jones, and the time that Ms. Jones arrived at the building, Ms. Jones had contacted a fellow colleague, Clark Browder (hereinafter "Mr. Browder"), and told him what had happened to Plaintiff.

53.     Plaintiff met with Ms. Jones in the cul-de-sac of the corridor, and asked Ms. Jones what to do.  At that time, Mr. Browder joined them, and appeared to be listening out of intrigue, rather than support.  He then stated: "It looks like you're the next one," or words to that effect.

54.     Plaintiff interpreted Mr. Browder's words, and Ms. Jones' revelation about what had been done to her, as evidence that Mr. Alexander made a habit of such behavior, and that people in the office were aware of it, and condoned it.

55.     Because Plaintiff did not have a comfortable working relationship with Mr. Browder, she became uneasy, and even more unsure of what to do.  The group disbursed, and Plaintiff went back to her desk.

56.     Plaintiff remained at her desk until it was time for her to leave, and then she left work.

57.      The next day, August 15, Plaintiff went back to work.  Ms. Jones was still on leave. Luckily for Plaintiff, Mr. Alexander had a meeting at another location, and was not in the office.

58.     Ms. Jones attempted to call Plaintiff to check on her, but Plaintiff was having issues with her work phone, so she began texting Ms. Jones.  In the text exchange between Ms. Jones and Plaintiff, Ms. Jones indicated that she expected Mr. Alexander to harass and assault Plaintiff again, because he had done so to Ms. Jones on several occasions, and he had done so to an employee in the Traffic Management Center named Angie.

59.     Plaintiff was so unsettled that she chose not to come to work on the 16th, and did not have any further contacts with Mr. Alexander until August 17.

60.     On August 17th, at 10:39 am, Mr. Alexander, for the first time ever, texted Plaintiff on her personal phone asking if she was going to be at work that day.  Plaintiff indicated that she was at the office.

61.     Being unsure of who she could trust to report the harassment to, on August 17, Plaintiff reached out to newly hired supervisor, Peter O'Neil (hereinafter "Mr. O'Neil"), who was a former firefighter.  Plaintiff's hope was that Mr. O'Neil would be unbiased, and that he would escalate the matter to the appropriate person.

62.     Unfortunately, Mr. O'Neil was in training on the 17th, and Plaintiff was not able to speak to him until on or about August 23rd.  On that date, Plaintiff reported the sexual harassment to Mr. O'Neil in person, knowing that regulations require supervisors to report and escalate such matters. Plaintiff expected Mr. O'Neil to do so because of his background at the DC Fire Department.

63.     On August 29th, Mr. Alexander called Plaintiff into his office, and stated that someone had lodged a complaint against Plaintiff for "smacking gum" loudly and making a threat. Plaintiff does not chew gum, therefore she knew the accusation was false.  However, she interpreted the admonition from Mr. Alexander as a warning that he could get Plaintiff in trouble.

64.     Fearing for her job, Plaintiff sent an email to Human Resources (hereinafter "HR"), refuting each and every allegation that was supposedly made against her regarding the chewing gum and making a threat.  HR responded that they would speak with Mr. Alexander about the accusation, but nothing further was ever done about the false accusation, or the attempt to intimidate Plaintiff.

65.     In the days following August 17th, Mr. Alexander started to continuously communicate with Plaintiff.  For the first time, he gave Plaintiff overtime pay, even though Plaintiff was not actually working the overtime hours, which is what Mr. Alexander was doing for Ms. Jones.

66.     This likely unlawful scheme to overpay Ms. Jones and Plaintiff, was an effort to give them a benefit, as well as to draw them into something Mr. Alexander could hold over their heads.

67.     Additionally, Mr. Alexander continued to try to have inappropriate sexualized conversations about Plaintiff, and continued to speak about her appearance.

68.     Mr. Alexander also gave Plaintiff good assignments, and gave Plaintiff work flexibility she never had before.  He then began to consistently compliment Plaintiff in emails, and give her credit for exemplary work.

69.     All of this was in stark contrast with the way Mr. Alexander was behaving prior to the kiss in his office.  The message sent to Plaintiff was clear:  So long as she remained quiet and compliant, her work circumstances and pay would benefit.

70.     Because of Mr. Alexander's seniority and power in the organization, and Plaintiff's fear about what he could to her job security, Plaintiff opted to seek a transfer to a different physical location, away from Mr. Alexander, rather than to continue to escalate her complaint after her report to Mr. O'Neil proved fruitless.

71.     Plaintiff repeatedly asked Mr. Alexander to allow her to work at the alternate location, in both verbal and written requests, and Mr. Alexander repeatedly denied the request.

72.     To the contrary, Mr. Alexander moved Plaintiff's work area to a location with a camera directly over her desk so that Mr. Alexander could monitor her movements.

73.     Mr. Alexander gave Plaintiff even more fraudulent overtime, and assigned Plaintiff to every project and communication he had, to keep Plaintiff close to him.

74.     At a loss as to what to do, Plaintiff started using her leave to avoid Mr. Alexander.  Plaintiff toiled with the idea of reporting Mr. Alexander to HR, but because her colleagues had made it

clear that Mr. Alexander was powerful and had gotten away with similar behavior, Plaintiff feared for her employment.

75.     Over the course of a year, Plaintiff was trapped in a situation that she felt she could not escape.  On a near daily basis, Mr. Alexander would make sexual comments, comments about Plaintiffs physique and dress, raise inappropriate topics, and hovered around Plaintiff to keep her close to him.

76.     Additionally, Mr. Alexander would occasionally tell Plaintiff that someone in senior management was unhappy with her, and that it was Mr. Alexander who was protecting her employment.

77.     The fear, anger, resentment and anxiety that was created by this work situation wreaked havoc on Plaintiff's mental and physical wellbeing.  Plaintiff gained weight, started to struggle with sleeping, and was prescribed medication for depression.

78.     Plaintiff was particularly concerned that her deteriorating physical health would cause a relapse of her cancer.  Importantly, shortly before Plaintiff was diagnosed with breast cancer, her mother had passed away from the disease.  So Plaintiff was well aware that despite her remission, her cancer could come back.

79.      By April of 2019, Plaintiff began to feel so trapped by Mr. Alexander's actions that she refused all of the overtime he was essentially "gifting" to her, which was the term he used to describe the fraudulent overtime assignments.

80.     At that time, Plaintiff escalated her demands to be moved to a different physical location, and her communications with Ms. Jones abated because Ms. Jones continued to take the "gifted" overtime hours.

81.     Thereafter, Mr. Alexander began to retaliate against Plaintiff by taking away all of her assignments, isolating and cutting off communication with her, causing her colleagues to also cut off communications with Plaintiff, blocking Plaintiff from being able to get supplies, and criticizing Plaintiff's work.

82.     In the span of a month, Mr. Alexander dropped Plaintiff's performance reviews from a 5, the highest possible rating, to a 2, a rating that would justify Plaintiff's termination.

83.     The whiplash reversal of Mr. Alexander's opinion of Plaintiff's performance, forced Plaintiff to have to write a rebuttal to her performance review, for the first time in her tenure with the City.

84.     For the following year, Plaintiff repeatedly asked to be moved from under Mr. Alexander, and did everything in her power to avoid him, including taking leave.

85.     Every time that Plaintiff reached out to HR about moving, HR would contact Mr. expander, who had sufficient power in the organization to simply put a stop to whatever Plaintiff requested.

86.     In March of 2020, the COVID pandemic began, and Plaintiff was finally able to get out from under Mr. Alexander's watchful eye and control, because she was able to telecommute.

87.     Getting some distance from Mr. Alexander allowed Plaintiff to renew her efforts to get management attention to what Mr. Alexander was doing, and on April 10, 2020, Plaintiff wrote to the EEO officer, Louisa Nguyen (hereinafter "Ms. Nguyen") to complain about the sexual harassment, bullying and retaliation of Mr. Alexander.

88.     Plaintiff met with Ms. Nguyen via zoom, and discussed in detail what was happening to her.  Ms. Nguyen asked Plaintiff to document and submit a statement, which Plaintiff did.

89.    On or about April 14, 2020, Mr. Alexander was removed as Plaintiff's direct supervisor. However, he remained part of Plaintiff's chain of command, and remained in a position to harm and undermine Plaintiff and her credibility.

90.    On or about April 27, 2020, Ms. Nguyen reached out to Plaintiff and asked if Plaintiff could resend the statement the statement that Plaintiff had written, which Plaintiff did.

91.    Ms. Nguyen also provided Plaintiff with a list of things to do, including filing an OHR Complaint, and reaching out to EEO officers in ***other*** DC government entities to lodge her sexual harassment complaint, claiming that Plaintiff could not lodge her complaint at DDOT.

92.    Ms. Nguyen then provided Plaintiff with a list of EEO offices in other DC departments for Plaintiff to contact in order obtain an exit letter because DDOT could not provide Plaintiff one.

93.    As a result of Ms. Ngyuen's directions, on or about May 5, 2020, Plaintiff filed a complaint with OHR.

94.    However, Plaintiff was unable to secure an exit letter.  Plaintiff reached out to the EEO office of the Metro Police Department (hereinafter "MPD"). The person she spoke with indicated that MPD EEO did not provide exit letters.

95.    Plaintiff also reached out to other EEO offices on the list given to her by Ms. Ngyuen, but did not get a call back from any of those departments.

96.    On May 19, 2020, Ms. Nguyen asked to speak with Plaintiff again, in order to get answers to some questions.

97.    On or about June 9, 2020, Plaintiff reached out to Ms. Ngyuen by email to have the discussion that Ms. Ngyuen requested.  Ms. Ngyuen responded the next day, stating that Plaintiff was not involved in an EEO process with DDOT, and reiterated that Plaintiff would have to go to another agency to get an exit letter.

98.     This circular, and misguided instruction from Ms. Nguyen essentially frustrated Plaintiff's ability to pursue her claim.

99.     On or about July 7, 2020, Plaintiff again reached out to Ms. Ngyuen to ascertain if anybody at DDOT was investigating or taking her sexual harassment and retaliation claims seriously.

100.    Ms. Nguyen responded that she was working on a draft report before going out on leave until November.

101.    Plaintiff did hear anything from DDOT for another month.  She therefore reached out to Nana Bailey (hereinafter "Ms. Bailey"), who was the Chief Equity and Inclusion Officer at DDOT, who responded on the 18th of August, stating that the report was still under review, and that Ms. Bailey would get back to Plaintiff by August 31, 2020.

102.    In her response to Ms. Bailey, Plaintiff raised the fact that the retaliation she was enduring was ongoing, and that Plaintiff was concerned because the timeline for the investigation was well past regulatory guidelines, and Plaintiff was struggling to maintain confidentiality, and to avoid Mr. Alexander.  Ms. Bailey agreed to meet with Plaintiff on or about August 24, 2020.

103.    On or about August 21, 2020, Plaintiff wrote again to Ms. Bailey, begging for help and intercession because of the verbal attacks and harassment from Mr. Alexander.

104.    Mr. Alexander's retaliation against Plaintiff was so blatant that Plaintiff's immediate supervisor, Michaud Gray (hereinafter "Ms. Gray") reported Mr. Alexander's retaliatory hostility to HR.

105.    On or about August 24, 2020, Plaintiff met with Ms. Bailey, at which time Ms. Bailey stated that the investigation was being reviewed by DDOT's legal team.

106.    Plaintiff also reached out to Ms. Karen Baldwin (hereinafter "Ms. Baldwin"), who worked at MPD, and was on the list given by Ms. Ngyuen for EEO counseling.  Ms. Baldwin never responded.

107.    Plaintiff did not hear from anyone until September 16, 2020, when she emailed Ms. Bailey, seeking to obtain the results of the investigation, which Ms. Bailey assured Plaintiff would be released no later than August 31, 2020.

108.    In her email Ms. Bailey, Plaintiff asserted that Mr. Alexander's retaliation was ongoing, and escalating to involve other team members.

109.    On September 17, 2020, Ms. Bailey responded, not with the results of the investigation, but with an assurance that the ongoing retaliation would be included in Plaintiff's complaint.

110.    Plaintiff did not hear from anyone again until June 19, 2021, when she wrote another email to Ms. Bailey.  Defendant blatantly violated applicable regulations regarding the conclusion of investigations, and dismissed and disrespected Plaintiff in an egregious fashion.

111.    In the period between September of 2020 and June of 2021, Plaintiff was assigned to yet another supervisor, but remained under the control of Mr. Alexander.

112.    Ms. Bailey responded in writing to Plaintiff's email on or about June 29, 2021, stating that the investigation that was promised to be completed and released by August 31, 2020, was "still under review."

113.    On or about August 16, 2021, OHR set up a mediation of Plaintiff's OHR complaint, but Defendant never responded and did not show up to the mediation.   The mediation was therefore rescheduled to October 15, 2021.

114.    On or about September 23, 2021, Plaintiff finally received the results of the investigation, which sustained large portions of Plaintiff's allegations, but oddly and unjustifiably undermined some of her claims because of a lack of evidence.

115.    On or about October 15, 2021, Plaintiff attended mediation with Defendant, that was not only unsuccessful, but so hostile to Plaintiff that the mediator recommended that she seek legal counsel.

116.    To this day, Plaintiff still works with Mr. Alexander, and on information and belief, he has not been held accountable for his actions in any way.  However, he no longer has any female direct reports.

## CLAIMS

## COUNT I

**(Violation of Title VII of the Civil Rights Act of 1967
42 U.S.C. § 2000e, *et seq.* and D.C. Human Rights Act, District of Columbia Code § 2-
1401.01 *et seq.* Gender Discrimination – Disparate Treatment/Sexual Harassment)**

117.    Plaintiff references and incorporates all allegations and assertions in the previous paragraphs as if fully restated herein.

118.    Plaintiff is a member of a protected class, female.

119.    Plaintiff was subjected to unwanted physical touching, and repeated sexualized and inappropriate comments from her superior.

120.    Plaintiff's superior attempted to control her by way of monitoring her movements, moving her desk closer to his office, refusing any of her requests to be moved to a different office, and loading Plaintiff with assignments so that she was in constant contact with him.

121.    Plaintiff's superior attempted to control her by assigning her false and fraudulent overtime hours that Plaintiff never actually worked, as a financial benefit and quid pro quo of remaining silent about his abuse and inappropriate behavior.

122.    Plaintiff reported the harassment that she was enduring to Defendant, who failed to take immediate and appropriate action to protect Plaintiff from her superior.

123.    As a direct and proximate cause of the sexual harassment, Plaintiff endured severe mental pain and anguish that forced her to seek professional help, and eventually to go on anti-depressant medication.

124.    Plaintiff herein seeks compensatory damages, as well as interest, costs and fees of not less than $1,000,000.00.

## COUNT II

### (Violation of Title VII of the Civil Rights Act of 1967
### 42 U.S.C. § 2000e, *et seq.* and D.C. Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.* Gender Discrimination – Retaliation)

125.    Plaintiff references and incorporates all allegations and assertions in the previous paragraphs as if fully restated herein.

126.    Plaintiff is a member of a protected class, female.

127.    Plaintiff was subjected to unwanted physical touching, and repeated sexualized and inappropriate comments from her superior.

128.    Plaintiff's superior attempted to control her by way of monitoring her movements, moving her desk closer to his office, refusing any of her requests to be moved to a different office, and loading Plaintiff with assignments so that she was in constant contact with him.

129.   Plaintiff's superior attempted to control her by assigning her false and fraudulent overtime hours that Plaintiff never actually worked, as a financial benefit and quid pro quo of remaining silent about his abuse and inappropriate behavior.

130.   Plaintiff reported the harassment that she was enduring to Defendant, who failed to take immediate and appropriate action to protect Plaintiff from her superior.

131.   As a result of, and in direct response to, Plaintiff's reporting of the sexual harassment she was enduring, Defendant allowed her superior to engage in systematic and blatant retaliation, in the form of creating a hostile work environment for Plaintiff.

132.   When it became clear that Plaintiff was not going to allow her superior to continue harassing her, her superior subjected Plaintiff to hellish work conditions in which she was taken off of virtually every assignment, isolated and kept out of work meetings, denied basic supplies, constantly and relentlessly criticized, and subjected to demeaning and humiliating treatment at every turn.

133.   Plaintiff was also retaliated against in the form of adverse action when her performance evaluation was dropped from a five (5) rating, which denoted outstanding performance, to a two (2) which denoted performance so poor it was worthy of termination.

134.   As a direct and proximate cause of the years of retaliation that Plaintiff was forced to endure because she reported sexual harassment, Plaintiff has suffered severe mental pain and anguish that forced her to seek professional help, and eventually to go on anti-depressant medication.

135.   Plaintiff herein seeks compensatory damages, as well as interest, costs and fees of not less than $1,000,000.00.

## COUNT III

**(Violation of 42 U.S.C. Section 1981 enforced via Section 1983
Based on a Violation of the Fifth Amendment to the Constitution as
Applied to the District of Columbia)**

136.    Plaintiff references and incorporates all allegations and assertions in the previous paragraphs as if fully restated herein.

137.    Plaintiff is a member of a protected class, African American.

138.    Plaintiff asserts that as an employee of the District of Columbia, she is in a contractual relationship with Defendant that allows her to bring a claim for violation of her Constitutional rights in making and enforcing contracts.

139.    Plaintiff seeks to enforce her rights under 42 U.S.C. § 1981, by asserting the instant claim under 42 U.S.C. § 1983, based on the Fifth Amendment to the Constitution as it relates to the District of Columbia.

140.    Plaintiff asserts that as part and parcel of her contracting rights with Defendant, she had a right to expect that Defendant would adhere to its own policies, procedures and regulations in investigating and responding to allegations of sexual misconduct.

141.    Plaintiff reported her superior for a serious violation of the District of Columbia code, and for behaviors that trespassed on Plaintiff's rights.

142.    Rather than taking Plaintiff's allegation seriously, Defendant grossly mismanaged and delayed the investigation, and let Plaintiff's claim linger for more than a year before taking any action.

143.    To date, Defendant has not taken any corrective action, and continues to subject Plaintiff to a person who blatantly sexually harassed her.

144.    Defendant has allowed Plaintiff's superior to engage in multiple financial and other violation without consequence or discipline and continues to do so.

145.    Plaintiff asserts that the reason for Defendants dereliction with respect to her claim is that Defendant does not value or take seriously the complaints of Black women.

146.    Plaintiff asserts that Defendant has a history, culture and custom of ignoring and devaluing Black women because of their race.

147.    Had Plaintiff been a white person, Defendant would have treated her more respectfully, would have promptly investigated her claims, and would have taken corrective action against Plaintiff's harasser.

148.    Defendant's unwillingness to discipline Plaintiff's harasser continues to encumber Plaintiff's employments in material ways, and constitutes a violation of her rights.

149.    As a direct and proximate cause of Defendant's racially motivated bias against Plaintiff, and its lack of concern, response, and remediation for her because of her race, Plaintiff has suffered severe mental and emotional anguish.

150.    Plaintiff herein seeks compensatory damages, as well as interest, costs and fees of not less than $1,000,000.00.

## COUNT IV

**(Violation of District of Columbia Whistleblower Protection Act,
D.C. Code § Code § 1-615-51, *et seq.* (WPA) –
Retaliatory Hostile Work Environment)**

151.    Plaintiff references and incorporates all allegations and assertions in the previous paragraphs as if fully restated herein.

152.    Via conversations with her co-workers, Ms. Jones, Plaintiff became aware that Mr. Alexander was awarding personnel he favored overtime work, compensated at 1.5 times the hourly rate, for work that they did not actually do.

153.    In June of 2019, when Mr. Alexander engaged in sexual harassment of Plaintiff, he also offered Plaintiff overtime work hours, compensated at 1.5 times the hourly rate, for work that Plaintiff did not actually do.

154.    In knowingly, and intentionally granting employees pay for work that was not done, Mr. Alexander engaged in fraud against the District of Columbia.

155.    Because of his position of power, he intimidated his subordinates into silence about the fraudulent scheme, by tacitly threatening their employment.  He further enticed his subordinates into remaining silent by essentially buying their silence with windfall payments.

156.    In April of 2020, Plaintiff engaged in a protected activity when she reported the fraudulent overtime practices of Mr. Alexander to DDOT as part of her EEO complaint.

157.    In retaliation for the protected activity, Mr. Alexander and Defendant created an intolerably hostile work environment for Plaintiff.  This included constant denigration of Plaintiff's work, threatening to discipline and terminate her employment, isolating her from her co-workers and keeping Plaintiff out of important meetings, removing assignments from Plaintiff, and recruiting others to denigrate and demean Plaintiff.

158.    Plaintiff continues to be subjected to retaliation, and continues to have to work for Mr. Alexander, which means the hostile work environment is ongoing, and her claim related thereto is timely filed herein.

159.    Defendants retaliation against Plaintiff was designed to harm and undermine her credibility and to intimidate her into silence.  It further was designed to dissuade other DDOT employees from reporting Mr. Alexander's pattern of fraudulent overtime assignments.

160.    As a direct and proximate cause of Mr. Alexander's creation and maintenance of an ongoing hostile work environment for Plaintiff, she has endured severe mental pain and anguish, as well as other physical symptoms. Plaintiff has also sought and needed the assistance of a medical professional to manage her depression.

161.    In compensation for the damages caused by Defendant's violation of the WPA, Plaintiff herein seeks no less than 1,000,000.00, as well as interest, costs fees, and attorney's fees.


## PRAYER FOR INJUNCTIVE RELIEF

162.    Plaintiff seeks an ORDER from the Court mandating that Defendant cease and desist from any and all further retaliatory acts against Plaintiff.


## JURY DEMAND

163.    Plaintiff seeks a jury trial for all claims so triable.




Respectfully submitted,

/s/ Pamela M. Keith
Pamela Keith [Bar No. 448421]
CENTER FOR EMPLOYMENT JUSTICE
650 Massachusetts Ave. NW
Suite 600
Washington, DC 20001
Tel: (202) 800-0292
Fax: (202) 807-5725

pamkeith@centerforemploymentjustice.com
*Counsel for Plaintiff*